UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THE NORTHERN ASSURANCE          )
COMPANY OF AMERICA,             )
                                )
          Plaintiff,            )     CIVIL ACTION NO.
                                )     12-10238-DPW
v.                              )
                                )
RICHARD W. WELLS, and MARY      )
E. WELLS,                       )
                                )
          Defendants.           )
                                )

MEMORANDUM AND ORDER
May 21, 2013

This declaratory judgment action seeks to clarify whether an insurance company is obligated to cover legal expenses and pay any potential judgment on an underlying wrongful death case.  The parties have cross-moved for summary judgment.  The Northern Assurance Company of America, as plaintiff, argues that a family-member-exclusion clause in the insurance policy absolves it of any payment obligations because the decedent and the insureds in the underlying wrongful death case are related.  Defendants argue that the clause does not apply because the executor of the estate is not related to the insureds.  Defendants also present a threshold issue, contending that this action is improper because the insurance policy requires that the parties resolve any disputes in binding arbitration.

## I. BACKGROUND

This case is rooted in the decedent William Pasquantonio, Jr.'s family tree.  His geneology therefore merits some exploration.

William, Jr.'s parents are William Pasquantonio, Sr. and Jane L'Heureux, who divorced in 2003.  The Defendants in this action, Richard and Mary Wells, are William, Jr.'s grandparents. They are also Jane L'Heureux's parents, and were William, Sr.'s parents-in-law until the divorce in 2003.

On June 22, 2008, 13-year old William Pasquantonio, Jr. died while on his grandparents' fishing boat, the *Hat Trick*, a 1996 Phoenix 29 SPX sport-fishing cruiser.

Richard and Mary Wells held an insurance policy on the *Hat Trick* through Northern Assurance, which covered "loss of life or bodily injury."  On July 15, 2008, they filed a "Statement of Loss" making a claim to Northern Assurance for the maximum permissible recovery under the Policy: $300,000.  Northern Assurance denied the claim on January 9, 2005.  The three relevant aspects of the Policy for purposes of this action are the family member exclusion, the arbitration clause, and the meaning of the term "losses."

A provision of the liability section of the Policy, titled "Losses Not Covered (Exclusions)," includes the following family member exclusion: "[Northern Assurance] will not pay: . . . for

2

any liability between or among 'family members.'"  The Policy defines "Family Members" as "persons related by blood, marriage or adoption (including a ward or foster child)."

The arbitration clause states that "[i]f [Mr. and Mrs. Wells] make a claim under this policy and [Northern Assurance] disagree[s] about whether the claim is payable or about the amount due to [Mr. and Mrs. Wells] under the policy, the disagreement must be resolved by binding arbitration . . . .  The demand for arbitration must be made within one (1) year of the date of the loss or damage."

Section B-1 of the Policy covers two forms of loss or damage: "1. *Loss* of life or bodily injury; [and] 2. Property *damage*." (emphasis added).  The Policy obligates Northern Assurance to "pay those sums [Mr. and Mrs. Wells] become legally obligated to pay as damages arising out of [Mr. and Mrs. Wells'] ownership, operation or maintenance of the covered 'yacht.'"

On June 20, 2011, three years after his son's death, and two and one half years after Northern Assurance denied Richard and Mary Wells' request for coverage, William, Sr. filed a wrongful death suit against the insureds, William, Jr.'s grandparents, alleging that their negligent operation of the *Hat Trick* caused William, Jr.'s death.  Northern Assurance is currently covering the costs of the defense for the underlying suit under a reservation of rights.

## II. STANDARD OF REVIEW

A movant is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The parties do not dispute the relevant facts. This case turns exclusively on interpretation of the insurance policy, which is a question of law for the court. *Allmerica Fin. Corp.* v. *Certain Underwriters at Lloyd's, London*, 871 N.E.2d 418, 425 (Mass. 2007). Courts apply state law to interpretation of maritime insurance contracts such as the one at issue here. *See New Hampshire Ins. Co.* v. *Dagnone*, 475 F.3d 35, 37 (1st Cir. 2007).

## III. DISCUSSION

I address at the threshold the question of proper forum, which is presented by Defendants' argument that arbitration is mandatory. Concluding that the arbitration provision is no longer relevant to the parties' dispute, I then turn to the merits of the parties' respective interpretive contentions.

### A. *Arbitration*

Defendants' arbitration demand is not timely. It comes more than two years too late. *See Rankin* v. *Allstate Ins. Co.*, 336 F.3d 8, 12 (1st Cir. 2003)("[A]n arbitration provision has to be invoked in a timely manner or the option is lost."). By the terms of the Policy, Richard and Mary Wells must bring any

4

"demand for arbitration . . . within one (1) year of the date of the loss or damage."  The language of the Policy and the actions of the parties prior to this lawsuit make clear that the phrase "date of the loss or damage" refers to the date that some kind of loss or damage happened to the "yacht" or those on board.  The arbitration provision itself states that it applies when Richard and Mary Wells "make a claim under this policy."  And where Defendants and Northern Assurance "disagree about whether the claim is payable or about the amount due . . . under the policy." Thus, in context, the arbitration provision clearly contemplates arbitrating the claim denial, not the dimensions of future disputes arising from the claim denial.[1]

The date of the injury and loss, the date of the initial claim, and the date of Northern Assurance's denial of the claim all occurred more than three years before Defendants demanded arbitration.  The demand therefore falls outside the one-year window for demanding arbitration.  William, Jr. lost his life on the *Hat Trick* on June 22, 2008, more than three and one half years before Defendants demanded arbitration on March 2, 2012.

---

[1] In fact, because the Policy language ties the contractual limitations period to the date of physical loss or damage to the ship or its passengers, it leaves open the possibility that the insureds could demand arbitration *before* the claim denial, and further leaves open the question whether the insurer could frustrate the arbitration clause by delaying its denial of a claim for more than one year.  Neither of those situations is presented by the facts of this case and I offer no views regarding how such a situation should be dealt with.

Defendants filed their claim with Northern Assurance for the maximum permitted recovery, $300,000, on July 15, 2008, about one month after William, Jr.'s death, but still more than three and one half years before Defendants demanded arbitration. Northern Assurance finally denied the claim, citing the family member exclusion, on January 2, 2009, just over three years before the arbitration demand. Because Defendants failed to make a timely demand to arbitrate their "disagree[ment] about whether the claim is payable . . . under the policy," I will not dismiss Northern Assurance's declaratory judgment action on the basis of the arbitration clause. *See Rankin*, 336 F.3d at 12.

Defendants' argument - that their demand for arbitration is timely because the phrase "loss or damage" in the Policy refers to legally determined damages from liability, which has not yet occurred because there has been no final resolution to the state court wrongful death action - contradicts the language of the Policy.[2] Moreover, Defendants' argument cannot be reconciled with the parties' actions.

----

[2] The interpretive dispute was ripe for resolution no later than the claim denial, but Northern Assurance chose not to pursue resolving it through arbitration in a timely fashion. Rather, Northern Assurance chose the vehicle of this later-filed declaratory judgment action to resolve the dispute. It is conceivable, although I take no position on the issue, that subsidiary disputes, for example, the reasonableness of the attorney's fees incurred for the cost of the defense or some elements of any damage award would start the arbitration demand clock running anew over a "amount due" under the policy. But, disputes over the basic question of interpretation were fully framed upon claim denial.

1. Policy Language

Defendants point to the preamble of the "Losses Covered" provision of Section B-1 – Liability Insurance.  The preamble to the Losses Covered section states "'We' [Northern Assurance] will pay those sums 'you' [Mr. and Mrs. Wells] become legally obligated to pay as damages arising out of 'your' ownership, operation or maintenance of the covered 'yacht' . . . ."  This does not, as Defendants contend, mean that phrase "date of the loss or damage" in the Policy's arbitration provision refers to the date of the entry of final judgment on a case.  Their suggestion that the preamble should somehow be incorporated into the arbitration provision is unpersuasive.  The Losses Covered preamble does not use the phrase "loss or damage," nor does it even use the individual words "loss" or "damage."  It states that Northern Assurance must cover the "sums" that the insured is legally obligated to pay as "damages" for liability.  In the context of a yacht insurance policy, the distinction between "damage" – meaning destruction or harm to property or people – and "damages" – meaning a legally determined amount of liability measured in dollars – is fundamental.  The fact that the two words share most of their letters in common does not diminish the distinction between two different concepts, nor does it permit Defendants to substitute the meaning of one for instances of the other throughout the Policy.  *See Bank* v. *Thermo Elemental, Inc.* 888 N.E.2d 897, 908-09 (Mass. 2008)("[A]lthough words used in one

7

undoubted sense in one place [in a will, contract, or statute] may be presumed to be used in the same meaning in another place in the writing, this rule itself is an aid and not an end.  It is generally to be followed but it is not inflexible.  It yields to the main purpose, which is to find out what the writing means as a whole." (alterations in original)(internal quotations omitted)).  Furthermore, in reading the Policy as a whole, it is clear that the phrase "loss or damage" in the arbitration provision refers to physical loss or damage to the yacht or its passengers, not to the legal liability arising from such an occurrence.

The Policy uses the words "loss" and "damage" throughout according to their standard, colloquial meanings, and in ways that would be inconsistent with Defendants' term-of-art interpretation.[3]  For instance, only nine lines below the phrase "loss or damage" in the arbitration provision, the Policy states "[w]ith respect to any claim for *loss or damage to insured property*, any suit against 'us' must be commenced *within one year of the date of loss or damage,*" using the identical phrasing from the arbitration provision to define the appropriate time window. (emphasis added).  In this clause, it is beyond any reasonable dispute that the phrase "date of loss or damage" must refer to

---

[3] Indeed, the Policy uses plain language throughout, avoiding terms of art wherever possible, including referring to the insureds as "you" and the insurer as "we."

"loss or damage to insured property."  It must therefore refer to the physical harm to the yacht, as it would make no sense to speak of damages in the form of legal liability *to* the insured property.  This phrasing is nearly identical to that included in the arbitration provision, and Defendants have put forth no justification for treating the two iterations differently.

The Policy is replete with similar uses of the words "loss" and "damage" that are consistent with a physical-harm meaning and inconsistent with a legal-liability meaning.  For instance, Section F – Duties After an Accident or Loss, states that "[i]f there is a loss or a claim . . . 'you' must:  1. Take all reasonable steps to *protect the insured property from further loss* . . . [and] 5. Advise anyone else responsible for the loss or damage as soon as possible, in writing that 'you' are holding them liable." (emphasis added).  Similarly, Section A – Property Insurance, states "'we' will pay for . . . accidental, direct *physical loss of or damage to the insured property*; [or] Physical loss or damage to the covered 'yacht' caused by a 'latent defect.'" (emphasis added).  Again, in this context, it would not make sense to speak of legal liability *to* the insured property. Nor would it be reasonable to interpret the insureds' obligation to notify others when they believe them to be responsible for "loss or damage" that the insureds would be "holding them liable" if the phrase "loss or damage" itself means legal liability.

9

## 2. Actions of the Parties

Defendants' actions have been inconsistent with their own proposed definition of the phrase "loss or damage."  In accordance with their "Duties After an Accident or Loss," Defendants filed a "detailed proof of loss signed and sworn . . . and evidence of an insured interest" on July 15, 2008.  Thus, immediately following William, Jr.'s death, Richard and Mary Wells operated under the assumption that the word "loss" both in the Policy and in their "Statement of Loss" referred to the tragic death of their grandson and not to some future potential legal liability.  Otherwise, they would not have filed the claim until the state court action resolved.

Defendants eventually demanded arbitration on March 2, 2012. But under their own proposed definition, there was nothing to arbitrate on March 2, 2012 because no court had yet determined liability under the Policy.  Under Defendants' proposed definition, to demand arbitration in March 2012 would be equivalent to requesting arbitration at the time of the accident: there was no determination of liability let alone a dispute over such a determination that might require arbitration.  Under Defendants interpretation, they could not even have requested arbitration regarding Northern Assurance's obligation to cover their legal expenses because Northern Assurance agreed to cover legal expenses under a reservation of rights pending the outcome of this declaratory action.

*                    *                    *

I find that the phrase "date of the loss or damage" in the clumsily constructed arbitration provision of the Policy refers to the date on which the physical injury occurred, not the date of a final judgment establishing liability in the wrongful death case or even the date on which costs of defense began to be incurred.  Defendants' arbitration request was untimely and I deny their request for dismissal on the basis of the arbitration provision.[4]

## B.   *Family Member Exclusion*

The parties agree that Massachusetts enforces insurance policy exclusions such as the family member exclusion in this case.  *See Kanamaru* v. *Holyoke Mut. Ins. Co.*, 892 N.E.2d 759, 763-64 (Mass. App. Ct. 2007) (upholding an exclusion for "anyone living in your household who is related to you by blood, marriage or adoption.  This includes wards, step-children or foster children").  The dispute centers around whose family member status is relevant:  the decedent's or the representative executor's.  If William, Jr.'s status is relevant, then the

---

[4] I also note that the presence of the arbitration provision does not foreclose the possibility of alternative legal action.  The Policy specifically contemplates legal actions beyond arbitration in a section entitled "Legal Action Against Us," which provides that once "'you' have complied with all terms of this policy, including arbitration . . . any suit against 'us' must be commenced within one (1) year of the date of loss or damage." Thus, the mere presence of the arbitration provision could not, alone, be sufficient grounds to dismiss Northern Assurance's declaratory judgment action.

family member exclusion applies because William, Jr. is the godson of Richard and Mary Wells (the insureds).  If William, Sr.'s status is relevant, then the family member exclusion does not apply because William, Sr. has not been related to Richard and Mary Wells since his divorce from Jane L'Heureux in 2003.

This question answers itself.  The Massachusetts wrongful death statute, M.G.L. 229 § 2, provides that damages for wrongful death may be "recovered in an action of tort commenced . . . by the executor or administrator of the deceased."  However, the executor does not bring the action on his own behalf, but "acts merely as a representative or conduit" for recovery. *Gaudette* v. *Webb,* 284 N.E.2d 220, 230 (Mass. 1972); *see also Hallett* v. *Town of Wrentham*, 499 N.E.2d 1189, 1192 (Mass. 1986). The position of executor exists because the decedent is not alive to bring his claim himself, but rather needs a representative. The executor brings an action on behalf of the decedent's estate, and on behalf of all other claimants.  He does not bring the claim on his own behalf.  By the very nature of being a *representative*, the executor does not speak on his own behalf and his own personal standing is not relevant.  *See Gaudette*, 284 N.E.2d at 229 ("[O]ur wrongful death statutes . . . requir[e] that any action for wrongful death be brought by a personal representative on behalf of the designated categories of beneficiaries.").  To hold otherwise would result in having the substantive rights of a decedent's estate depend on the

particular characteristics of the appointed executor.  Canons of contract construction counsel against such an interpretation. *See Demers Bros. Trucking, Inc.* v. *Certain Underwriters at Lloyd's, London*, 600 F. Supp. 2d 265, 278 (D. Mass. 2009)("When scrutinizing a contract, a court should interpret broad contract language so as to avoid absurd results."); *see also Emhart Indus., Inc.* v. *Century Indem. Co.*, 559 F.3d 57, 71 (1st Cir. 2009)(refusing to accept an interpretation of an insurance policy that would "lead to absurd results").

Defendants cite a First Circuit decision which observes that "[d]amages under [M.G.L. 229 § 2] shall be recovered in an action of tort by the executor or administrator of the deceased." *Mitchell* v. *U.S.*, 141 F.3d 8, 21 (1st Cir. 1998).  However they apparently ignore the next two sentences of the opinion, in which the First Circuit cautions against giving the executor special consideration because that "would elevate form over substance, looking less at the question, 'who is injured' and more at the question, 'who is technically bringing the suit.'"  *Id.* (citations omitted).

Although no Massachusetts court has directly addressed the issue, courts in other jurisdictions consistently consider the family-member status of the decedent rather than that of the executor or administrator.  *See Carpenter* v. *United Ohio Ins. Co*, 1997 WL 232727, *3 (May 9, 1997)(holding that administrator's claim failed because the represented decedent fell within a

family member exclusion in an insurance policy); *see
also Chrysler Credit Corp.* v. *United Servs. Auto. Assoc.*, 625
So.2d 69, 72-73 (Fla. Dist. Ct. App. 1993); *Wright* v. *State Farm
Mut. Auto. Ins. Co.*, 952 P.2d 73, 106-107 (Or. App. 1998).
Although in both *Chrysler* and *Wright*, the insurance policies at
issue excluded, by their terms, injury *to* a member of the
insured's family while the Northern Assurance Policy more
generically excludes "liability between or among 'family
members,'" the thrust of the exclusion is the same:  both seek to
exclude from coverage liability or harm between the insureds and
their family.

I find that Massachusetts courts would also consider the
family member status of the decedent rather than that of the
executor or administrator in applying a family member exclusion
clause.  In this case, because there is a direct familial
relationship between the insured grandparents and the decedent
child, any claim the child's father brings as executor of his
son's estate falls under the exclusion.

Even the most relevant case Defendants cite for the
proposition that an executor's personal status may be relevant,
*Johnson* v. *Georgia Farm Bureau Mut. Ins. Co.*, cannot sustain the
weight Defendants seek to place on it.[5]  In *Johnson*, a foreign

---

[5] The other cases Defendants cite in response stand only for the
entirely uncontroversial position that divorce legally divides a
family.  *See, e.g., Groves* v. *State Farm Life Ins. & Casualty
Co.*, 829 P.2d 1237 (Ariz. 1992); *Tobin* v. *Nat'l Grange Mut. Ins.*

state court action, the Georgia Court of Appeals held that the family member exclusion does not bar an ex-husband from bringing his own claim for his insured ex-wife's wrongful death because it was not derivative of the child's claims. *See* 616 S.E.2d 459, 462 (Ga. App. 2005).

By contrast, in this case, William, Sr. does not bring the case on his own behalf. The Massachusetts wrongful death statute does not permit him his own claim. *See* M.G.L. 229 §§ 1, 2. He can only bring the case as executor or administrator of the decedent's estate. Unlike the Georgia wrongful death statutes, which specifically provide causes of action to a surviving spouse or parent, *see* O.C.G.A. § 41-4-2(a) ("The surviving spouse or, if there is no surviving spouse, a child or children . . . may recover for the homicide of the spouse or parent the full value of the life of the decedent . . . ."); *id.* § 19-7-1(c)(2) ("If the deceased child does not leave a spouse or child, the right of

---

*Co.*, No. 9-117-B-S, 2009 WL 1683627 (D.Me. June 15, 2009) (Magistrate Recommended Decision and Order). None of these cases analyzes the effect of a divorced executor representing a family-member decedent.

In another case Defendants cite, *Allstate Ins.* v. *Shelton*, the court found that a man going through the process of divorce was not related - as that term was defined in his own insurance policy - to his new, co-habitatant girlfriend's daughter. 105 F.3d 514 (9th Cir. 1997). However, *Shelton* is not relevant to the facts in this case because in *Shelton*, the decedent child and the insured were not related and the question of the relevance of the executor's familial relationship never arose. By contrast, in this case, the decedent child and the insured grandparents are related and the question of the relevance of the executor's familial relationship is central to Defendants' argument.

recovery shall be in the parent or parents . . . ."),
Massachusetts does not segregate the right to recover for
wrongful death by claimant.  Massachusetts bundles the rights of
all claimants for a wrongful death and vests the executor with
the power to bring the suit.  Specifically, M.G.L. 223 § 2
provides that "[a] person who . . . by his negligence causes the
death of a person . . . under such circumstances that the
deceased could have recovered damages for personal injuries if
his death had not resulted . . . shall be liable in damages . . .
as provided in section one." (emphasis added).  Section 1
provides the method of distributing any recovery, specifying the
particular percentages allocated to various family
members/claimants based on the marital status of the decedent and
whether he had any children.  *See* M.G.L. 223 § 1.  Thus,
Massachusetts law specifies that claimants' rights are
necessarily derivative of the decedent's because they can only
recover if the decedent died "under such circumstances that the
deceased could have recovered damages for personal injuries if
his death had not resulted."  M.G.L. 223 § 2.  William, Sr. would
be entitled to the statutorily specified percentage of any
successful recovery for the wrongful death of his son, but he has
no independent claim himself.  I will not unbundle those rights
in contravention of Massachusetts law to allow William, Sr. to
circumvent the family member exclusion by bringing his own claim.

16

### III.   CONCLUSION

For the foregoing reasons, I GRANT Plaintiff's Motion for Summary Judgment (Dkt. 20), and DENY Defendants' cross-motion (Dkt. 23). I DENY Defendants' Motion to Strike (Dkt. 45) as moot.  I direct the Clerk to enter judgment for the Plaintiff.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE